Okay, our final case this morning is number 17-1574, N. Ray Schollmayer, Mr. Robinson. The crowd is here to see me. Good morning and may it please the court. Doug Robinson for Appellant with Community Council Tables, Leigh Ann Rakers and Matt Cutler. Once a person gets Restless Leg Syndrome, it's a chronic condition. There's no cure, only treatments. Unlike other treatments, Dr. Schollmayer's invention can be used for the long-term treatment of RLS without augmentation. This invention is making a real difference in people's lives. It's different from the prior art. Nonetheless, the Patent Office found it to be obvious. The 103 rejection is improper. Can I ask you a question? Did you ever actually argue to the board that Rempler taught away from transdermal administration? We did, Your Honor. We argued, and this is at Appendix 402 and 403 and then again at Appendix 732. 402 and 403 is where we made the argument in front of the examiner, very specifically. Then at Appendix 732, the argument again is referenced and that is in our appellate brief at the board level. 732? Yes, Your Honor. We believe that Rempler teaches away from Mueller and as a result, the board and the Patent Office failed to show that a person of ordinary skill in the art would have been motivated to combine those references to arrive at the claimed methods for long-term treatment of RLS. Our teaching away argument, I think, is simple and it's direct. Look at Rempler's Paragraph 9. That refers to the PCT counterpart of Mueller, the other reference at issue here, as disclosing a transdermal patch, which the PTO relies heavily on this point. But Rempler points away from the transdermal path. In its very next sentence, it says, Transdermal systems, however, are not suitable for all patients and they pose a number of inherent problems. Rempler then discusses those problems over the following four paragraphs, specifically identifying the following. Immunogenic potential, possible toxicity, inadequately individualizable dosing, all with transdermal patches. The Patent Office characterizes Rempler as simply identifying Mueller as a transdermal, but that characterization is disingenuous in light of Rempler's actual language. Do you agree that Parkinson's and RLS are related? In the sense that they both relate to the dopamine levels? I'm sorry, Your Honor, I didn't get that last part. They both relate to dopamine levels? At some level, dopamine is involved in both diseases, yes. Well, when you say at some level, I mean, they are very related diseases, are they not? I don't know about very related diseases. I think the action of dopamine in the brain has an effect in both Restless Leg Syndrome and in Parkinson's disease. Right, and that's exactly what is going on here, is trying to affect the action of dopamine in the brain, correct? When we say here, are we talking about Mueller, Your Honor? Well, let's talk about your own invention. The point is to affect the levels of dopamine in the brain. For long-term treatment of RLS, the claim, looking at the claim, it's administering the dosage form for long-term treatment of RLS. Right, and so you're saying that Rempler's discussion of the dosage forms for long-term treatment of Parkinson's is irrelevant to that question? I'm saying that Rempler teaches away from transdermal dosage forms and instead champions the use of a depot form. That's the argument, different dosage forms. That's why the person of ordinary skill in the art would not have gone from Rempler and looked at Mueller, because Rempler says not to do that. Rempler identifies two paths. It references the transdermal system of Mueller, but it champions... So what if we put aside the teaching away argument? Then the combination would have been obvious, right? No, Your Honor, because we also have unexpected results that we believe counteract any showing of obviousness. And we also have, Your Honor, an argument that the dosing window would not have been obvious based on an identification of... In Mueller to treat Parkinson's, whereas in RLS, of course, we have augmentation. Augmentation is irrelevant to Parkinson's. So we don't think that the dosing window of Mueller to treat Parkinson's would have led to an obviousness, should have led to an obviousness rejection. Though you do have in Rempler the reference to the Mueller patch, right? I'm sorry, Your Honor. You have in Rempler the reference to the Mueller patch. Yes, Your Honor, we do. And so I think that's a core issue here. So it's a reference in passing. It says that the Rempler depot could be used with a transdermal patch. And I think we've all seen a lot of pharmaceutical patents. This happens a lot in pharmaceutical patents. You have a core invention, and you say we could use it with this litany of other things in the pharmaceutical arts. And so I think we go back again to the... So you have a general teaching there, but you have a specific teaching of why a depot is better. So, of course, we look at the prior art, Rempler, as a whole. And I think the person of ordinary skill in the art looking at that would look at the specific teaching of Rempler that depot should be used. And in light of that, this passing reference to transdermal, we think that is insubstantial evidence. And we don't even have to look at what the hypothetical person of ordinary skill would have done. Rempler did it. Rempler had Mueller's transdermal patch. And Rempler said, instead, I don't want to do that. I want to do the depot form because I think it's better. Yes. Preferring one form over another, that's a fair reading of Rempler. But that's a far cry from actually teaching away from doing it. I would disagree, Your Honor. I think that under this court's statement, for example, in Depew versus Medtronic, here the person of ordinary skill in the art would have been discouraged from following the transdermal route set out in Mueller and thus would have been in a different direction, led in a different direction than the one taken by Dr. Shulman. I believe that's a teaching away. Now, we also, as I referenced, have, and I would also note that this is an issue that the board did not address. So we believe under Newvasive that's legal error. I will also say, Your Honor, that we have evidence of unexpected results. Didn't the board specifically find that your unexpected results evidence was insufficient because you didn't actually compare with the closest prior art? Correct, Your Honor, and a couple issues with that. We disagree, of course. A couple issues. One, it's not exactly clear what art we were supposed to compare to. I surmise, perhaps, they wanted us to compare to Rempler. We don't think that's an appropriate requirement. Rempler is a depot. We're transdermal. In our view, it doesn't make sense to compare to the different dosage form when we're claiming transdermal instead of depot. There are other prior art devices, formulations that we did compare to, including a Lyseride patch, which wasn't even able to get to market. What we did, in Dr. Shomare's declaration, what we did was we compared to the closest available prior art. To the extent that the board is requiring us to make prior art when it didn't exist, for example, take an oral form and put it in transdermal, that's not required. The law does not require us to create prior art that didn't otherwise exist. Getting back, I think unexpected results is the flip side of Rempler's teaching away. Rempler's teaching away shows... Rempler says, take the easy path of depot, not the hard path of transdermal. Had Rempler appreciated the results that transdermal got in our invention, maybe it would have done something different. The question isn't whether Rempler itself did it. The question is whether one of skill in the art, looking at all of that disclosure, Rempler even referring to Mueller would have found it obvious. Correct, Your Honor. I agree, that is the question. My answer is that it would not. That is looking directly at the specific evidence that we are dealing with, what Rempler actually did, I think is good evidence of what the person of ordinary skill in the art would have done. The fact that we achieved these unexpected results that are unrebutted substantially by the Patent Office, I think further illustrates the non-obviousness of our invention. Now, I will say quickly, Your Honors, we also have some additional claims besides Claim 1 that we separately argue in our briefing. I want to note our arguments with respect to Claim 1 apply to those as well. Also, with those additional claims, our view, the Patent Office did not identify where the record shows the additional limitations are present. And then lastly, with respect to Claim 45, that is a four-reference obviousness rejection, and it is Horowski and Brecht. We think that is inappropriate. Horowski does not concern rotigotine, and Brecht was a combination therapy patent. I would like to reserve the remainder of my time, please. Thank you, Mr. Robinson. Thank you. Ms. Dang, is that right? Yes. Good morning, Your Honors. May it please the Court. I would just like to address quickly the waiver of the teaching away issue. My counsel for the appellant cited to page 732 of the appendix as evidence of its argument, the teaching away issue. If you turn to page 732 and look at the heading, it's an appeal brief from a 2011 appeal at the Board, and the appeal that led to the decision that's at issue here is a 2013 appeal. And I would just note that counsel has not pointed to anything in the 2013 brief, of which there are only one or two pages in the appendix. So even if there's not waiver, though, you argue that it doesn't really teach away? Yes. So the law of teaching away requires more than just a preference. I agree with that. So we have said that you can get to the point of teaching away, but we've even said, though, even in the absence of clear teaching away, it's still relevant that it says this is not a preferred or not a recommended route. That, in other words, that goes into the overall calculus about what one of skill and the art would have done in the circumstances. Right? Yes, I would agree with that. Okay, so how do you deal with the fact that Rempler specifically says transdermal is not a preferred method? Well, again, I would say, first, the overall law says that a preference is not enough, so we would need something more. And if we turn to just the appendix page 105 of Rempler, you can see, I'm sorry, page 107. This is where Rempler begins its text. Rempler begins in the background section describing some of the prior art, and in that prior art, it touches on oral dosage and oral administration and how it has some bioavailability problems. And then it says that is why transdermal systems have been developed. So Rempler actually states that the transdermal administration is an improvement on the oral administrations. Right, so it basically creates a hierarchy, transdermal maybe being better than oral but not being the best. You could call it that. Yes, and since Rempler is proposing depot formulation, you can see that it does have a preference for this new invention that it proposes. But it also includes as one of its embodiments a kit with a transdermal patch on appendix 111, paragraph 123. So it would be difficult to say that a person of skill in the art reading Rempler would be dissuaded from trying the Mueller patch to treat RLS. And I would like to address the unexpected results data that Epon has put forward. On that point, you argue somehow that our court is wrong about even considering unexpected results. Are you really pursuing that line of inquiry? I would say that under this court's case law, it is true that unexpected results can overcome motivation to combine, yes. In this case, though, the motivation to combine is so strong. It's all in Rempler. Rempler cites the Mueller patch with the dosage in it. And so in this case, even if they were unexpected, I would say it does not overcome the very strong motivation to combine. And I would also say that the appellant has not shown the results to be unexpected. The table on the opening brief, page 35, shows a comparison of a rotigotine patch with oral administrations of two other dopamine agonists. And those clinical tests were run by other parties. And so you can't tell whether the results are from switching to a patch or from switching from those other dopamine agonists. So we would argue that the results aren't unexpected because the prior art tells us that switching to patches improves on the augmentation side effect. Where does the prior art tell you that switching to patches improves on augmentation side effects, since the patches in Mueller were only used for Parkinson's, which did not have the augmentation effect, right? That's correct. Although Rempler does tell us that switching to the patch improves on the bioavailability from the oral. But there was unrebutted testimony that dopamine agonists still caused augmentation in up to a third of patients. So why wouldn't it have been unexpected that this particular formulation caused almost no augmentation in anybody? Well, I would argue that even if it showed that this particular formulation showed almost no augmentation, it's not clear from their evidence what factors are leading to that improvement. And Horowski, which is on Appendix 115, in paragraph 6 and 9, Horowski addresses exactly this issue. What column? What lines? Appendix 115, paragraph 6 and paragraph 9. It says, in paragraph 6, the second sentence starts, bioavailability is increased by the TTS, the transdermal therapeutic system, as compared to plural administration. So that's just echoing what Rempler says in its background section. And I would just like to address one more point about the dosage. It is true that the Mueller patch is a Parkinson's disease patch. However, in Rempler, which discusses both restless leg syndrome and Parkinson's disease, it includes many embodiments and sometimes with dosage and never distinguishes dosage between one disease and the other. Thank you. Thank you, Mr. Robinson. Thank you, Your Honor. Briefly address the waiver point that my co-counsel made. If you look at page 830 of the Joint Appendix, it's another appeal brief. Page 830. A30? A830, 830. Makes the same statement as the one that appears at page 732. And was that in connection with the later? The later briefing, yes, Your Honor. And I think regardless, Your Honor, the teaching away issue was fairly before the examiner, was fairly before the board, and is fairly before this court. I think waiver is inappropriate under the court's case law, including last year's Icon v. Strava case, which addressed a different related waiver issue. Now, I'll note that counsel for the patent office had made some arguments about inherency and lack of nexus in their briefing. They did not address those in argument, so I won't either. But really what they seem to focus on in the counterargument is, again, the closest prior art issue. And the basic point there is that we compared our invention to the prior art that was available. And I think that's an appropriate way to show unexpected results. And here, I think it's also important when they talk about teaching away. I think what they're saying, if I understand correctly, is that Rempler taught that using a patch rather than oral dosage would improve. So the improvement by comparing it to an oral formulation wasn't unexpected, right? That's what they're saying. But I think it ignores the issue that the claim also requires long-term therapy. And I think what our unexpected results shows is that in long-term therapy, the effectiveness combined with the lack of augmentation relative to what was out there before was, A, better, and, B, the evidence is that it's unexpected. We have declaration testimony explaining why this would have been unexpected. And I think it's also important, again, to note, I respect your Honor's point that the question is what the person of ordinary skill and the hypothetical person would have done. But, again, I'll reiterate that we know that the actual person of ordinary skill in the art didn't go down the transdermal path for long-term treatment of RLS, despite Rempler's acknowledgment of the existence of that, because I think that's great evidence of the fact that the evidence overall taught away from the path that Dr. Schollmayer took. Anything else? Other than that, Your Honor, I'll rest on the briefing. Okay. Thank you. Thank you both, Counsel. Thank you. That concludes our session for this morning. Thank you. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock a.m.